UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CINDY L. BOHNERT, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4: 21 CV 256 DDN ) |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Cindy L. Bohnert for disability insurance benefits (DIB) under Title II of the Social Security Act (Act). The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is affirmed.

## BACKGROUND

Plaintiff was born on June 24, 1963. (Tr. 73.) She protectively filed her application for DIB on February 4, 2019. (Tr. 152-58.) She alleged an amended disability onset date (AOD) of June 23, 2013, the day before her 50th birthday, and alleged disability due to atrial fibrillation and chronic obstructive pulmonary disease (COPD). (Tr. 47, 69.) Her claims were denied, and she requested a hearing before an administrative law judge (ALJ). (Tr. 74-80.)

On June 24, 2020, following a hearing, the ALJ concluded that plaintiff was not disabled under the Act. (Tr. 15-22.) The Appeals Council denied review. Accordingly,

the ALJ's decision became the final decision of the Commissioner subject to judicial review by this Court under 42 U.S.C. § 405(g).  (Tr. 1-6.)

This is a Title II application only, with a date-last-insured (DLI) of December 31, 2013. Therefore, the relevant period at issue encompasses the amended AOD, June 24, 2013, through the DLI of December 31, 2013.  To be entitled to disability benefits under Title II, plaintiff has the burden to show that she was disabled prior to the expiration of her DLI on December 31, 2013.  *See* 20 C.F.R. § 404.130; *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009).

## ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to her appeal.

On October 8, 2011, plaintiff was diagnosed with bronchitis after being seen as a walk-in at the emergency room of St. Anthony's Medical Center in Arnold, Missouri, for a harsh, painful cough.  (Tr. 224-28.)

On February 1, 2012, plaintiff established care with cardiologist Paul H. Gibson, M.D., after a November 2011 chest x-ray showed an enlarged heart.  She reported shortness of breath and chest discomfort but related it to pneumonia.  She also reported chest pain with activity, stress, and being easily fatigued.  Her history included smoking cigarettes for over 20 years and consuming 25-30 cans of beer per week.  She was diagnosed with atrial flutter and because of the arrythmia, was admitted to St. Anthony's Medical Center. Plaintiff's symptoms improved over her hospital course, and her heart rate was controlled with medication.  She was discharged February 4, 2012, and scheduled for outpatient cardiac catheterization.  (Tr. 231, 234, 243, 320-21.)

A February 4, 2012 chest x-ray revealed bilateral atelectasis (lung collapse) or infiltrate with cardiomegaly (enlarged heart).  (Tr. 348.)

A February 7, 2012 cardiac catheterization revealed mild to moderate left ventricular dysfunction secondary to mild hypokinesis, a condition in which the heart is

- 2 -

not contracting as much as normal. Her ejection fraction was mildly reduced at 45%. Other testing showed elevated pulmonary artery pressures. (Tr. 346-47.)

An x-ray of plaintiff's chest taken February 17, 2012, revealed an enlarged heart. A nuclear medicine ventilation perfusion scan indicated obstructive airways disease. The perfusion scan noted a low probability of blood clotting in the lung. Treatment notes state the reason for the testing was dyspnea or shortness of breath, noting plaintiff used tobacco and had had pneumonia in November 2011, as well as recurrent sinus and ear infections and bronchitis starting the previous April. (Tr. 282-85.)

On March 21, 2012, plaintiff saw Dr. Gibson and reported sinus related headaches, shortness of breath, occasional palpitation/irregular heartbeats, fatigue, and chest pain and shortness of breath on exertion. A review of her systems was positive for fatigue and a three-pound weight loss. On exam she had trace edema or swelling. She had a regular heart rate, and her lungs were clear. She was scheduled for cardioversion, a procedure that uses quick, low-energy shocks to restore a regular heart rate. (Tr. 318.)

On March 26, 2012, plaintiff underwent a successful elective cardioversion of atrial fibrillation. (Tr. 287.)

On June 11, 2012, plaintiff saw Dr. Gibson and reported edema or swelling, and that she sometimes breathes heavily. She reported improved stamina since her last visit but also nighttime palpitations with dyspnea. She reported chest pressure with occasional chest pain with activity that was relieved with rest. She had occasional dizziness when moving from a sitting to standing position and mild orthopnea, or breathlessness in the recumbent position, and edema. She also had some general weakness on exertion. She had no edema upon examination. She had a regular heart rate and rhythm with no rubs or gallops (abnormal sounds), and her lungs were clear to auscultation. A Holter monitor and echocardiogram were ordered, and she was to follow up in four months. (Tr. 316-17.)

On June 14, 2012, an echocardiogram with Doppler showed largely normal findings. (Tr. 333-35.)

On July 25, 2012, plaintiff saw Dr. Gibson reporting that she had good stamina and was staying active. She denied having much fatigue. She reported mild chest pressure and burning with occasional chest pain with activity that was relieved with rest. This often occurred in the heat with shortness of breath. She had occasional dizziness moving from sitting to standing and some general weakness on exertion. Her heart and lungs were unremarkable, and she had no edema. (Tr. 314-15.)

On November 21, 2012, plaintiff saw Dr. Gibson and reported pain from her neck radiating to her arm with lumps, swelling, and difficulty swallowing or moving her neck. She had chest pain and pressure with activity. She reported she was always short of breath because of being a smoker. She had regular heart rate and rhythm with no murmur, gallops, or rubs. Her lungs were clear to auscultation, and she did not have edema. She was instructed to return in four months. (Tr. 312-13.)

On April 11, 2013, plaintiff reported to Dr. Gibson that she was doing better than her last visit. Her stamina, palpitations, and dyspnea had improved. She had mild occasional midsternal chest pain described as a dull ache and heaviness lasting for moments. Her examination findings were unremarkable. She was advised to exercise 30 minutes most days of the week. She reported walking 30-40 minutes a few days per week. (Tr. 310-11.)

An echocardiogram was performed the same day. It revealed a normal aorta, mild to moderate pulmonary hypertension, trace aortic regurgitation but no evidence of aortic stenosis, a mildly dilated left atrium, and a mildly enlarged right ventricle. Other findings were normal. (Tr. 329-31.)

Plaintiff saw Dr. Gibson on August 21, 2013, for follow-up, reporting good stamina overall and that she was staying active. She had occasional mild chest pressure without significant orthopnea (breathlessness in a recumbent position). She had shortness of breath on exertion and bilateral calf pain when climbing hills. On exam, she had normal heart and lung findings, and no edema. (Tr. 305-09.)

On February 19, 2014, plaintiff reported decreased stamina with mild dyspnea on exertion and intermittent chest pain with increased activity that resolved with rest.  She also reported a recent cold and ear infection.  (Tr. 307.)

On September 3, 2014, plaintiff saw Dr. Gibson for follow up.  Her diagnoses were coronary artery disease, chest pain, atrial fibrillation, and congestive cardiomyopathy, a disease of the heart muscle that makes it harder to pump blood to the rest of the body.  She reported chest pressure and chest pain with activity and a cough.  She reported feeling tight in the chest but better since menopause.  She reported no shortness of breath and good stamina.  An echocardiogram and stress test were scheduled, and she was to return in four months.  (Tr. 304-5.)

On September 25, 2014, an echocardiogram showed largely normal findings except for trace amounts of aortic regurgitation or leaking, mild tricuspid valve  regurgitation, low-normal left-ventricular systolic function with an ejection fraction between 50 to 55%, and right ventricular volume overload.  Her right ventricle was mildly enlarged as was her right atrium. (Tr. 323.)  A carotid ultrasound the same day revealed minimal thickening in the right common and right internal carotid arteries and in the left common carotid artery.  (Tr. 325.)  A stress test was also performed.  A resting electrocardiogram revealed right atrial enlargement.  She achieved 75% of the maximum predicted heart rate and the test had to be stopped due to shortness of breath and fatigue.   (Tr. 327.)

A February 10, 2015 chest x-ray revealed an enlarged heart with unchanged central pulmonary vessels and slightly more linear lung collapse.  (Tr. 1046.)

Plaintiff was hospitalized with pneumonia April 6-10, 2016, at St. Anthony's Medical Center.  (Tr. 1045-48.)  Pulmonary function testing showed severe restrictive ventilatory limitation without a significant response to bronchodilators and moderately reduced diffusing capacity. (Tr. 870-72.) Her discharge diagnoses were community spread pneumonia, tobacco use disorder, acute exacerbation of COPD, and morbid obesity due to excess calories.  She was discharged on continuous oxygen and was to undergo an outpatient sleep study for obstructive sleep apnea.  (Tr. 1110-31.)

- 5 -

On May 10, 2016, following her hospitalization, plaintiff was seen at St. Anthony's Pulmonary Specialists.  She reported feeling better but was not yet back to normal.  She complained of allergy-related breathing issues.  Pulmonary function tests showed severe restriction.  She reported recently needing afternoon naps and waking in the morning feeling tired.  On exam she had decreased lung sounds, her oxygen saturation was 93%, and she was instructed to start using a Pro Air inhaler and undergo a sleep study.  (Tr. 850-52.)

A June 1, 2016 CT scan of her chest suggested pulmonary edema.  (Tr. 411-12.)  A polysomnography the same day showed oxygen desaturation, especially during REM sleep, and mild obstructive sleep apnea.  She did not meet the criteria for CPAP placement, but oxygen was started.  (Tr. 856, 861-62.)

A January 2, 2017 chest x-ray revealed an enlarged heart with chronic changes in the lungs similar in appearance to her prior exam from April 2016.  (Tr. 1055.)

On February 2, 2019, plaintiff saw pulmonologist Melissa Weis, M.D. Plaintiff's diagnoses included obstructive sleep apnea, restrictive lung disease, which was likely in part related to her obesity, pulmonary hypertension due to COPD, seasonal allergic rhinitis due to pollen, nicotine dependence in remission, and body mass index (BMI) 31–31.9.  She was experiencing bronchitis and reported nasal congestion and ear issues.  A review of her systems was positive for congestion and ear pain.  Her oxygen saturation was 93% on two liters of oxygen.  (Tr. 429-31.)

On December 4, 2019, Dr. Gibson completed a Summary Impairment Questionnaire.  In it he included functional limitations that limited plaintiff to standing and/or walking up to one hour total in an 8-hour workday.  He stated that November 20, 2018, was the earliest date his description of plaintiff's symptoms and limitations applied.  (Tr. 692-93.)

## **ALJ HEARING**

On June 9, 2020, plaintiff appeared and testified to the following before an ALJ. (Tr. 41-66.) She has a twelfth-grade education. She worked at Pondarosa Restaurant from 1990 until 2008. (Tr. 46.) Her doctors started finding breathing problems in 2015 and 2017. Her medication was changed to help her heart symptoms, and a lung doctor later changed her medications. She is a former smoker and has been cigarette free for about three years. (Tr. 54-55.)

During 2012 and 2013, she could not stand on her feet for very long, perhaps half an hour, and she used breathers and nebulizers. When asked for how long she could remain on her feet or walk, she stated she could not do very well if the terrain was hilly and she could not do so for an extended period of time. During that time it was difficult for her to pick things up and she would have noticed difficulty breathing and an increased heart rate. It was difficult for her to carry a gallon of milk. She was instructed by her doctor to exercise by walking around malls, etc. which was difficult for her. At that time she ran back and forth to her doctor's office a lot. Then, and now, humidity and mold exacerbate her breathing problems. (Tr. 54-59, 61-62.)

Currently she does not do a whole lot. She has breathing problems and has used an oxygen tank since about 2015. A pulmonary function test was not performed until 2016, and she was diagnosed with COPD in 2018. (Tr. 55, 60-61.)

A vocational expert also testified to the following. Plaintiff's past relevant work (PRW) is identified as salad bar attendant, which is semi-skilled work (SVP 3) generally and actually performed at the light exertional level, and cook, which is skilled work (SVP 5) actually and generally performed at the medium exertional level. (Tr. 63-65.)

At the hearing, counsel advised the ALJ that plaintiff's theory of disability included the application of medical-vocational grid guideline 201.14. According to this guideline, plaintiff would be found disabled if limited to a sedentary residual functional capacity (RFC).

## DECISION OF THE ALJ

On June 24, 2020, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 15-22.)  At Step One, the ALJ found that plaintiff did not engage in substantial gainful activity between June 23, 2013, her amended AOD, and December 31, 2013, her DLI.  (Tr. 17.)  At Step Two, the ALJ found that through the date last insured plaintiff had the medically determinable severe impairments of atrial fibrillation, coronary artery disease, chronic heart failure, and obesity.

At Step Three the ALJ determined that plaintiff did not have any impairment or combination of impairments that met or equaled a listed presumptively disabling impairment.  (Tr. 18.)

At Step Four the ALJ found that through her DLI, plaintiff had the residual functional capacity to perform light work as defined under the Act, except that she could never climb ropes, ladders, or scaffolds.  She must have no concentrated exposure to unprotected heights or hazardous machinery and no concentrated exposure to extreme heat, extreme cold, humidity, and pulmonary irritants such as dust, fumes, odors, gases, and poor ventilation.  (Tr. 18-20.)

Also at Step Four, with vocational expert testimony, the ALJ found that through her DLI, plaintiff was unable to perform her past relevant work.

At Step Five the ALJ found there were other jobs that existed in the national economy that claimant could have performed at that time such as electrical assembler, merchandise marker, and office helper.  The ALJ concluded that for the period from June 23 through December 31, 2013, plaintiff was not disabled under the Act.  (Tr. 21-22.)

## GENERAL LEGAL PRINCIPLES

In reviewing the Commissioner's denial of an application for disability insurance benefits, the Court determines whether the decision complies with the relevant legal requirements and is supported by substantial evidence in the record.  *See* 42 U.S.C.

§ 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). The review considers not only the record for the existence of substantial evidence in support of the Commissioner's decision. It also considers whatever in the record fairly detracts from that decision. *Cox v. Apfel,* 160 F.3d 1203, 1207 (8th Cir. 1998). This Court may not reverse the Commissioner's decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because the Court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step process); *Pates-Fires*, 564 F.3d at 942.

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). *Id.* § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to do so. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant

retains the RFC to perform other work that exists in significant numbers in the national economy.  *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

## DISCUSSION

Plaintiff asserts the ALJ erred in (1) assessing her residual functional capacity; (2) evaluating the opinion evidence of her treating cardiologist Paul Gibson, M.D.; and (3) evaluating her subjective symptoms.

### Residual Functional Capacity (RFC)

In this case, the ALJ found that plaintiff had the RFC to perform "light" work as defined under the Act, during the relevant period, June 23, 2013, to December 31, 2013. The ALJ reviewed the portion of the record relating to the relevant period, but concluded that the normal findings, improvement with treatment, and treatment recommendations relating to this period did not support plaintiff's allegations.  The ALJ noted that plaintiff's more significant problems such as increased breathing difficulties did not occur until long after the expiration of her DLI, and the treating source opinions estimated limitations beginning in 2018, long after the DLI.  (Tr. 18-20, 693.)

Plaintiff argues the ALJ failed to support her RFC with some medical evidence addressing her ability to function in the workplace nor did she attempt to obtain evidence addressing her ability to do the same.  She argues that the only physician that offered an opinion as to her work-related limitations related to her cardiac impairments was Dr. Paul Gibson, her treating cardiologist.  She argues that because the ALJ found the opinion unpersuasive and since the state agency physician found insufficient evidence to issue an RFC, there was no medical evidence addressing her ability to function in the workplace in the file.

Plaintiff contends that rather than obtaining evidence from a medical professional or recontacting her treating physician, the ALJ developed an RFC based on her own interpretation of the medical evidence but failed to explain how the medical evidence

- 10 -

supported a light RFC. She complains the ALJ failed to include a narrative discussion citing medical facts and non-medical evidence explaining how the evidence supports the conclusion she could perform light work.

Plaintiff further argues the ALJ improperly drew inferences from the medical reports to form an opinion of her RFC, drawing conclusions beyond her expertise. She argues that the ALJ's conclusions regarding how congestive heart failure, atrial fibrillation, coronary artery disease, and cardiomegaly affect her ability to perform work-related activities are without medical support. She contends there is record evidence to suggest she is not capable of performing light work, when considering her dyspnea on exertion, her obesity, and her ongoing complaints of shortness of breath with exertion. In sum, she argues the ALJ failed to identify evidence that supports the light RFC.

Finally, plaintiff contends there is nothing in the record evidence to suggest she "recovered" from "some heart problems." She argues that although she had some improvement at times, the record evidence shows ongoing difficulties from her cardiac impairments requiring ongoing treatment, testing, and hospitalizations. She argues this case demonstrates why ALJs are not qualified to determine RFC without evidence from a medical professional.

The Court disagrees. The regulations define RFC as the most an individual is still able to do despite the limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a). The ALJ will "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence" in the case. 20 C.F.R. § 404.1520(e). Plaintiff has the burden to prove RFC. *See Kraus v. Saul*, 988 F. 3d 1019, 1024 (8th Cir. 2021). Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. However, there is no requirement that an RFC finding be supported by a specific medical opinion. *See Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).

- 11 -

In this case, the ALJ considered plaintiff's medical record evidence relating to the limited period at issue and concluded it showed plaintiff's RFC is supported by "some medical evidence." The ALJ discussed treatment and findings prior to the relevant period and noted the following. Plaintiff had an acute case of bronchitis in 2011, as well as a brief hospital admission for atrial fibrillation and chronic heart failure. Plaintiff's heart condition improved with treatment during this stay, and a cardiologist scheduled her for a left heart catheterization. Subsequent testing ruled out a pulmonary embolus as a cause for her dyspnea. She had a successful electrical cardioversion of her atrial fibrillation in March 2012. Follow up echocardiogram testing and appointments with her cardiologist Dr. Gibson in 2012 were unremarkable. Her course of treatment, well before the relevant period, showed improvement with treatment and mostly normal findings. The ALJ noted this trend of unremarkable findings and routine treatment continued during the period at issue. In April 2013, shortly before her AOD, plaintiff told Dr. Gibson she was feeling better overall with only mild chest pain that lasted "moments." (Tr. 19.)

In August 2013, the only treatment record during the relevant period, plaintiff reported "good stamina overall" and that she was staying active. She denied significant palpitations, and while she has pain in her calves when "climbing hills," she denied significant claudication or limping with daily walking. (Tr. 19.)

Plaintiff's physical examination showed regular heart rate and rhythm with no murmur, gallops, or rubs, and her lungs were clear to auscultation. She did not have any edema. The cardiologist recommended a follow-up visit in six months. At the follow-up appointment, two months after her insured status expired, plaintiff indicated she was not exercising but was staying active. She denied syncope, palpitations, irregular heartbeat, or edema. Her physical examination was unchanged, and while she reported decreased stamina and intermittent chest pain, her doctor recommended increased cardiovascular exercise and to return for routine care in six months. (Tr. 306-09.)

The ALJ also considered the opinion of cardiologist Dr. Gibson who treated plaintiff before, during, and after the relevant period. In December 2019 Dr. Gibson provided an

opinion that suggested disabling limitations beginning in November 2018, almost five years after plaintiff's date last insured.  (Tr. 20, 693.)  As detailed below, the ALJ found this opinion was not persuasive with respect to plaintiff's condition during the relevant period.  Based on this evidence, the ALJ concluded that plaintiff responded well to treatment and that her doctors were advising her to increase exercise. (Tr. 20.) *See Buford v. Colvin,* 824 F.3d 793, 797 (8th Cir. 2016)(impairments that are controlled with treatment or medication cannot be considered disabling).  The ALJ further noted plaintiff's infrequent treatment during the relevant period did not support her allegations of disabling symptoms. (Tr. 20.)  *See Kamann v. Colvin*, 721 F.3d 945, 950-51 (8th Cir. 2013)(infrequent medical treatment is a consideration when evaluating plaintiff's statements).  The ALJ concluded that the RFC was supported by and consistent with the evidence relating to the relevant period. (Tr. 20.)  Based on the above, this Court concludes plaintiff's RFC is supported by some medical evidence.

Plaintiff argues that because the ALJ discounted Dr. Gibson's opinion, there was no medical evidence addressing her ability to function in the workplace.   However, there is no requirement that the ALJ base an RFC finding on a specific medical opinion. *See Hensley*, 829 F.3d at 932.  Although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner based on all the relevant evidence, including medical records, observations of treating physicians and others, and an individual's own description of his or her limitations. *See Lawrence v. Saul*, 970 F.3d 989, 995 (8th Cir. 2020).

Here, the ALJ considered the longitudinal record, which showed improvement with treatment, infrequent treatment during the relevant period, and worsening of symptoms well after the DLI.  The ALJ arrived at a range of light work based on a consideration of all the record evidence, particularly medical records, plaintiff's response to treatment, and objective findings.  The ALJ also considered plaintiff's statements but noted they did not relate to the relevant period.  (Tr. 20.)

Plaintiff also argues the ALJ substituted her own judgment for that of the medical experts and that she should have developed the record to obtain an opinion from a medical professional. While the ALJ does have a duty to fully and fairly develop the record, the ALJ can issue a decision without obtaining additional evidence when other record evidence provides a sufficient basis for a decision, such as the case here. *See Kamann*, 721 F.3d at 950. Here, the longitudinal record of treatment supported the ALJ's RFC finding, and no further development was needed. The Court also notes that plaintiff is not asserting that the ALJ is missing medical records from the relevant period, but that the ALJ should have obtained additional opinion evidence relating to this period. Although it is the ALJ's responsibility to formulate the claimant's RFC, the burden is on the claimant to establish the limitations contained in the RFC. *See Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016). Plaintiff could have submitted opinion evidence relevant to the period at issue to support her claim. However, the ALJ had all the relevant treatment records and at the hearing plaintiff's counsel confirmed that the record was complete. (Tr. 46.) Based on this medical evidence, the ALJ concluded plaintiff had responded well to treatment and did not develop significant breathing problems until after her DLI. (Tr. 20.) The ALJ was not required to obtain an opinion from a medical expert as plaintiff contends. *See Hensley*, 829 F.3d at 932.

The medical records showing improvement with infrequent and generally conservative management supported this RFC. (Tr. 18-20.) Normal findings and routine treatment can support a finding of light work when the record is "silent" on work-related restrictions such as the length of time plaintiff can stand or the amount of weight she can lift. *See Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (upholding ALJ's finding that plaintiff could perform light work based on largely mild or normal objective findings regarding her back condition, even though the medical evidence was silent with regard to work-related restrictions such as the length of time she [could] sit, stand, and walk and the amount of weight she can carry.); *Cf. Flynn v. Astrue*, 513 F.3d 788, 789 (8th Cir. 2008) (finding that physicians' observations that the claimant had normal muscle strength and

mobility constituted medical evidence supporting the ALJ's conclusion that the claimant could lift 20 pounds occasionally and 10 pounds frequently.).  Here, the Court concludes the ALJ properly considered the entire record and found the range of light work in the RFC.

### Opinion of Cardiologist Paul H. Gibson, M.D.

Plaintiff next argues the ALJ erred in her evaluation of cardiologist Dr. Gibson, because the ALJ failed to explain how the supportability and consistency factors were considered or to discuss the relevance of the objective medical evidence or whether there was any supporting explanation provided.  Plaintiff notes there was only one relevant opinion in her case, that of treating cardiologist Dr. Gibson, whose statement included functional limitations that limit her to standing and/or walking up to only 1 hour total in an 8-hour workday.  (Tr. 692-93.)  She argues that despite these limitations, the ALJ concluded she could stand and/or walk 6 out of 8 hours in an 8-hour workday as required of light work per the Dictionary of Occupational Titles.  She argues the ALJ failed to discuss the consistency of the opinion with the evidence from other medical and non-medical sources.  She contends there was only one conclusory statement with no discussion of how the evidence supported or was inconsistent with the opinion as required by 20 C.F.R. § 404.1520c.  This Court disagrees.

Plaintiff applied for benefits after March 27, 2017, and therefore the ALJ applied the new set of regulations for evaluating medical evidence.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132 (Mar. 27, 2017)).  The revised regulations redefine how evidence is categorized, including "medical opinion" and "other medical evidence," and how an ALJ will consider these categories of evidence in making the RFC determination.  *See* 20 C.F.R. §§ 404.1513(a), 404.1520c.

The new rules provide that adjudicators are to evaluate all medical opinions and findings using the factors delineated in the new regulations.  Supportability and consistency are the most important factors and their application must be explained.  Other factors which

- 15 -

"will be considered" and about which adjudicators "may but are not required to explain" are the medical source's "treatment relationship" with the claimant, including the length, frequency, purpose and extent of the treating relationship, and whether the source has an examining (as opposed to non-examining) relationship with the claimant; specialization; and "other factors" such as whether the source is familiar with other evidence in the claim or understands the Administration's disability program's policies and evidentiary requirements. *See* 20 C.F.R. § 404.1520c(b), (c) (2017).

Under the new regulations, a "medical opinion" is a statement from a medical source about what an individual can still do despite her impairments and includes limitations or restrictions about the ability to perform physical, mental, sensory, and/or environmental demands of work.  20 C.F.R. § 404.1513(a)(2).  A medical opinion does not include judgments about the nature and severity of an individual's impairments, medical history, clinical findings, diagnosis, response to prescribed treatment, or prognosis. 20 C.F.R. § 404.1513(a)(3).

The ALJ concluded Dr. Gibson's opinion was not persuasive because there was no way to determine if the work limitations set out in his treating source statement were based on both the cardiac impairments and the COPD and if they related to the time the opinion was expressed or to the relevant time period.  The ALJ decision also concluded his opinion was not consistent with the treatment notes during the period at issue, "as discussed above." (Tr. 20.)

First, in his statement Dr. Gibson himself indicated that the limitations described only purported to describe plaintiff's functioning as of November 2018, almost five years after her insured status expired.  (Tr. 693).  As the ALJ discussed, Dr. Gibson's opinion was not supported by cardiology notes from the relevant period.  (Tr. 20.)  Specifically, Dr. Gibson noted a diagnosis of COPD, which does not appear in his records during the relevant period and does not appear as a diagnosis until 2018. (Tr. 20, 610-13.)  The ALJ concluded that Dr. Gibson's opinion was not supported by his own treatment records during the period at issue. (Tr. 20.)  *See* 10 20 C.F.R. § 404.1520c(c)(1) (the more relevant

the objective medical evidence and supporting explanations presented by a treating source, the more persuasive the opinion will be). The ALJ also found Dr. Gibson's opinion was not consistent with the record. (Tr. 20.) Contrary to plaintiff's assertion, the ALJ did not provide one conclusory statement with no further discussion. The ALJ found Dr. Gibson's opinion was not consistent with the treatment notes and referenced her discussion of that evidence in the decision "as discussed above." (Tr. 20.)

In her discussion of the evidence and consideration of plaintiff's subjective complaints, the ALJ noted that plaintiff responded well to treatment for a heart related hospitalization prior to the end of relevant period, and during the relevant period she received routine care. The ALJ noted that plaintiff did not have significant breathing problems until after the expiration of her DLI. The ALJ's reference to evidence "as discussed above" referred to plaintiff's response to treatment and mild symptoms with routine care discussed earlier in the decision. (Tr. 19-20.) The mild symptoms and routine care were inconsistent with the significant restrictions in Dr. Gibson's opinion.

Further, the ALJ did not ignore plaintiff's respiratory symptoms as plaintiff suggests. The RFC included a number of specific limitations to account for her respiratory symptoms, including no concentrated exposure to extreme heat, extreme cold, humidity, and pulmonary irritants such as dust, fumes, odors, gases, and poor ventilation. (Tr. 18.) The ALJ reasonably accounted for those limitations consistent with the evidence from the relevant period.

The Court rejects plaintiff's assertion that the ALJ should have recontacted Dr. Gibson to clarify his opinion. The ALJ can make a decision when the evidence is complete and consistent, and if the record is sufficient, the ALJ can make a decision based on the existing record. *See* 20 C.F.R. § 404.1520b. Here, the ALJ had complete evidence of plaintiff's treatment that was not inconsistent, and the evidence was based on medically acceptable diagnostic techniques, i.e., plaintiff was treated by a cardiologist. *See id*. at § 404.1520b(b). On the other hand, if the evidence is inconsistent, the ALJ looks to the remaining evidence to determine if she can determine whether plaintiff is disabled based

on the existing evidence. *See id*. at § 404.1520b(b)(1).  The Court notes plaintiff does not argue that there were additional medical records from this time but that the ALJ should have sought additional medical opinions.  In this case the record evidence was sufficient for the ALJ to make a determination.  The ALJ discounted the opinion of Dr. Gibson because it was not consistent with the record evidence, although the remaining evidence showed consistent findings and treatment in the records for the ALJ to base her decision. (Tr. 19-20.)

## Evaluation of Plaintiff's Subjective Complaints

Plaintiff finally argues the ALJ's credibility analysis is deficient and lacks the support of substantial evidence.  She argues the ALJ failed to identify any persuasive evidence that would lead to a conclusion that her symptoms, although possibly more limiting than the objective evidence suggests, are not genuine.  She contends the decision fails to explain how the evidence is inconsistent with her subjective symptoms and that the reasons cited by the ALJ concluding her subjective symptoms are inconsistent with the evidence are unsupported and unexplained.  She argues the ALJ failed to address the *Polaski* factors, and to the extent she did, failed to make any express credibility determinations, detail reasons for discrediting her testimony, or set forth the inconsistencies upon which she relied.  She contends the ALJ failed to discuss her testimony as it relates to credibility.  Defendant counters that the ALJ properly evaluated her symptoms.

The Court concludes the ALJ's credibility determination was justified.  Credibility determinations are the province of the ALJ, and as long as "good reasons and substantial evidence" support the ALJ's evaluation of credibility, the reviewing court will defer to her decision.  *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  An ALJ may decline to credit a claimant's subjective complaints "if the evidence as a whole is inconsistent with the claimant's testimony." *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

When evaluating the claimant's subjective complaints, the ALJ must consider all the evidence, including objective medical evidence, the claimant's work history, and evidence relating to the *Polaski* factors: (1) the claimant's daily activities; (2) the duration, frequency,

and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions. 739 F.2d at 1322.

Here, the ALJ gave good reasons for discounting plaintiff's subjective complaints, and her findings are supported by substantial evidence. The ALJ devoted a portion of her decision to her evaluation of the consistency of plaintiff's statements with the record evidence. The ALJ found plaintiff's statements inconsistent with the evidence showing plaintiff responded to treatment for her heart condition. She specifically noted that prior to the relevant period plaintiff was hospitalized for heart conditions that stabilized during her stay, that she received routine care with her cardiologist through her DLI, and that her cardiologist recommended increased exercise. (Tr. 19-20.) *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (conservative management is a valid consideration for the ALJ). The ALJ also noted plaintiff's symptoms did not worsen until after her DLI. (Tr. 20.)

The ALJ also noted that plaintiff's testimony appeared related to her current status, rather than her past status during the relevant period. The ALJ noted plaintiff's testimony that her doctors started finding breathing problems in 2015 and 2017; that her medication was changed to help her heart symptoms; and that a lung doctor subsequently changed her medications. The ALJ noted that plaintiff testified about using breathers and nebulizers and about breathing problems, although a pulmonary function testing was not performed until 2016, and she was not diagnosed with COPD until 2018. The ALJ noted plaintiff's testimony that she was on oxygen in approximately 2015, two years after her DLI. The record demonstrated plaintiff had some breathing related problems during the period at issue, and the ALJ made findings in the RFC to accommodate any breathing problems by including pulmonary and environmental restrictions. However, the ALJ concluded that the evidence and testimony suggested plaintiff's conditions worsened after the relevant period, and she did not find plaintiff's subjective complaints consistent with the evidence during the relevant period. Therefore, based on plaintiff's reports, the medical evidence, and plaintiff's response to treatment, the ALJ found plaintiff's statements were not entirely

consistent with the record. The ALJ did find exertional and non-exertional limitations during the relevant period to account for some of plaintiff's limitations but declined to find her allegations fully supported after evaluating this evidence. (Tr. 18-20.)

In this case the ALJ gave good reasons for finding plaintiff's statements were inconsistent with the evidence during the relevant period. The ALJ discussed why she declined to find plaintiff's testimony consistent with the evidence, and she gave good reasons supported by substantial evidence after a discussion of the evidence. The ALJ need not explicitly discuss every factor under the regulations as long as she gives good reasons that are supported by substantial evidence, as she did in this case. *See Swink*, 931 F.3d at 770-71.

This Court concludes the ALJ's findings are supported by substantial evidence and the ALJ properly considered plaintiff's credibility.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. A separate Judgment Order is issued herewith.

       /s/ David D. Noce       
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 12, 2022.